1

2

THE HONORABLE ROBERT S. LASNIK

3

4

5

6

7      UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
8              AT SEATTLE

9   TORREY GRAGG, on his own behalf and
   on behalf of other similarly situated persons,        Case No. 2:12−cv−00576−RSL
10

11              Plaintiff,
                                                PLAINTIFF'S MOTION FOR CLASS
12   v.                                         CERTIFICATION

13   ORANGE CAB COMPANY, INC., a
   Washington corporation; and RIDECHARGE,      NOTE ON MOTION CALENDAR:
14   INC., a Delaware Corporation, doing business   August 9, 2013
   as TAXI MAGIC,
15
              Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12−cv−00576−RSL)

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

# Table of Contents

I.    INTRODUCTION ................................................................................................ 1

II.    RELIEF REQUESTED....................................................................................... 2

III.    STATEMENT OF FACTS ................................................................................. 2

    A.    RideCharge Competes for Customers Who Use Smartphones.................................. 2

    B.    RideCharge Promotes Taxi Magic in Text Messages to Non-Users .......................... 3

    C.    RideCharge Requires Taxi Companies to Allow Text Message Marketing................ 4

    D.    RideCharge Sent Promotional Text Messages To Over 100,000 Orange Cab Customers ............................................................................................................. 5

    E.    RideCharge Failed To Obtain Express Consent For Its Marketing Messages............ 6

IV.    STATEMENT OF ISSUES ................................................................................ 7

V.    ARGUMENT ...................................................................................................... 7

    A.    The Policies Behind Rule 23 Require Certification to Protect the Interests of Justice and the Rights of the Class........................................................................................ 7

    B.    Rule 23 Certification is Based on the Facts and Legal Theory as Pled ...................... 9

    C.    The Class Meets Each of Four Requirements of Rule 23(a) .................................... 10

        1.    Defendants' widespread illegal marketing campaign satisfies numerosity. ...... 11

        2.    Common questions of fact and law dominate Plaintiff's class claims due to Defendants uniform illegal marketing campaign............................................... 11

        3.    Mr. Gragg's claims are typical of the class and no conflict exists. ................... 14

        4.    The class is adequately represented by both Mr. Gragg and class counsel. ...... 15

    D.    A Class Action is Maintainable Under Rule 23(b)(3) .............................................. 16

    E.    In the Alternative, a Class Action Is Maintainable Under Rule 23(b)(2) Because Plaintiff Seeks Injunctive Relief to Stop all Future Violations of the Law ............. 21

VI.    CONCLUSION.................................................................................................. 22

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12–cv–00576–RSL)

Page i

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

# Table of Authorities

**Cases**

*Agne v. Papa John's Int'l,* 286 F.R.D.559, 567-68 (W.D.Wash. 2012) .................... 14, 16, 20, 22

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ................................................. 19

*Armstrong v. Davis,* 275 F.3d 849, 868-69 (9th Cir. 2001) ........................................... 17

*Arthur v. Sallie Mae, Inc.,* No. C10-0198JLR, 2012 WL 90101 .............................. 14, 22

*Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir. 1975)................................................. 10

*Catholic Soc. Services, Inc. v. I.N.S.,* 232 F.3d 1139, 1153 (9th Cir. 2000) ................ 10

*Critchfield Physical Therapy v. Taranto Group, Inc.,* 263 P.3d 767, 780 (Kan. 2011) .............. 9

*Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54 (D. Mass. 1997) ........................ 23

*Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571, 582 (9th Cir. 2010) ........................... 13, 18

*Durrett v. John Deere Co.,* 150 F.R.D. 555, 558 (N.D. Tex. 1993) ................................. 15

*Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir. 1968) ..................................................... 10

*Freedman v. Louisiana Pacific Corp.,* 922 F. Supp. 377, 398 (D. Or. 1996)..................... 10

*Gulf Oil Co. v. Barnard,* 452 U.S. 89, 99 (1981)............................................................. 9

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019-20 (9th Cir. 1998) ............................... 13

*In re Cement and Concrete Antitrust Litig.,* 27 Fed.R. Serv.2d 1334 (D. Ariz. 1979)................ 23

*In re Wash. Mut. Mortgage-Backed Sec. Litig.,* 276 F.R.D. 658, 668 (W.D. Wash. 2011) ... 22, 23

*Irwin v. Mascott,* 96 F. Supp. 2d 968, 971-72 (N.D. Cal. 1999) ................................... 11

*Jordan v. County of Los Angeles,* 669 F.2d 1311, 1320 (9th Cir. 1982) ...................... 13

*Kavu, Inc. v. Omnipak Corp.,* 246 F.R.D. 642 (W.D. Wash. 2007)........................ passim

*Kelley v. Microsoft Corp.,* 395 F. App'x 431, 432 (9th Cir. 2010) ............................... 19

*Lo v. Oxnard European Motors, LLC,* No. 11CV1009 JLS MDD, 2011 WL 6300050... 14, 16, 21

*McClintic v. Lithia Motors, Inc.,* No. C11-859RAJ, 2012 WL 112211 .............................. 14

*Mortimore v. F.D.I.C.,* 197 F.R.D. 432, 438 (W.D. Wash. 2000).............................. 19, 24

*Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 598 (2d Cir. 1986)............................... 10

*S. Ferry LP No. 2 v. Killinger,* 271 F.R.D. 653, 657 (W.D. Wash. 2011)....................... 11

*Sax v. World Wide Press, Inc.,* 809 F.2d 610, 615 (9th Cir. 1987) ............................... 10

*Scott v. Cingular Wireless,* 160 Wn.2d 843, 857, 161 P.3d 1000, 1007 (2007) ............. 9

*Slaven v. BP America, Inc.,* 190 F.R.D. 649 (C.D. Ca. 2000) ...................................... 12

*Sollenbarger  v. Mountain States Tel. and Tel. Co.,* 121 F.R.D. 417 (D.N.M. 1988) ................ 23

*Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir. 2003)................................................. 17

*Targin Sign Sys. v. Preferred Chiro. Ctr., Ltd.,* 679 F. Supp. 2d 894, 898-99 (N.D. Ill. 2010) ... 21

*United Steel v. ConocoPhillips Co.,* 593 F.3d 802, 809 (9th Cir. 2010) ........................ 10, 11, 18

*Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2557, 180 L. Ed. 2d 374 (2011) ........................ 24

*Wang v. Chinese Daily News, Inc.,* 623 F.3d 743, 754 (9th Cir. 2010) *cert. granted, judgment vacated,* 132 S. Ct. 74 (2011)................................................. 24

*Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168, 1174 (9th Cir. 2010) ....................... 19

*Z.D. ex rel. J.D. v. Grp. Health Co-op.,* 2012 WL 5033422 (W.D. Wash. Oct. 17, 2012).......... 12

**Treatises**

Moore's Federal Practice & Procedure § 23.46[4] (3d ed.)....................................................... 10

Newberg & Conte, *Newberg on Class Action* § 7.20 (4th ed. 2002)............................... 11, 12, 18

Wright & Miller, Federal Practice and Procedure § 1764 ........................................................ 17

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

# I. INTRODUCTION

Defendants transmitted an advertisement to thousands of cellular telephones in Washington State as part of a nationwide marketing campaign.  To accomplish this mass marketing, defendant RideCharge, Inc., engineered a proprietary computer system that sends thousands of text messages automatically—every day—without human interference. RideCharge purposely targeted consumers who were not using its products and had no prior business relationship.  RideCharge sent these consumers an advertisement for its services without express consent.

Plaintiff Torrey Gragg now moves the Court for class certification under Fed. R. Civ. P. 23.  The proposed class includes consumers who were sent text messages in violation of the Telephone Consumer Protection Act ("TCPA") and the Washington Commercial Electronic Mail Act ("CEMA").  In Washington alone, as many as 100,000 consumers or more have been affected by Defendants' uniform, widespread, and illegal practice.

Class actions under the TCPA and CEMA epitomize the policies of Rule 23 certification. This is clear from the fact that courts in the Ninth Circuit have been near unanimous in certification of TCPA cases.   In this case and others like it, certification is vital to judicial economy and indispensable to the enforcement of rights afforded by Congress and the Washington Legislature in the TCPA and CEMA.

Because this case arises out of a uniform illegal marketing campaign, common issues of fact and law not only predominate but overwhelm any individual issues.  In particular, RideCharge contends that advanced consent, which is an affirmative defense under the TCPA, can be *implied* when a consumer either provides their telephone number in ordering a cab, or simply fails to block their number from being pulled from caller I.D—as occurred with Mr. Gragg. Whether this is *express* consent "clearly and unmistakably stated" under *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 955 (9th Cir. 2009) is a common issue of law.

Other common issues include the following:  When a Seattle, Washington consumer orders a taxi by voice telephone call to Orange Cab, is this affirmative consent for a text message

from a completely separate company in Virginia, advertising that company's products?  Are Defendants' automated text messaging computers an "automatic telephone dialing system" under the TCPA?  Were Defendants' text messages "commercial text messages" under CEMA?  Were Defendants' text messages knowing or willful violations of the TCPA?

It is difficult to imagine a case better suited for certification because the common answers to these issues will affect the entire class.  Class certification is appropriate under Rule 23 considering the uniformity of claims, the uniformity of facts, and the multitudes harmed by defendants' illegal text messaging scheme.  The issues of law and fact are straightforward and virtually identical.  The claims asserted can be administered most efficiently using the class vehicle, as the Western District of Washington has recognized in four previous class actions under the TCPA and CEMA.  A class action is superior to thousands of separate lawsuits, which would prove unwieldy and inefficient, overburden the court system, and potentially lead to inconsistent adjudications of the same issues of law and fact.  Finally, as this Court has recognized on multiple occasions, class certification under Rule 23 also ensures that the low value of individual recovery under the TCPA and CEMA will not serve as a barrier to seeking justice.  Plaintiff respectfully requests that a class action be certified on behalf all consumers who were sent illegal text messages by defendants.

## II. RELIEF REQUESTED

Pursuant to Fed. R. Civ. P. 23, Plaintiff respectfully requests that the Court certify the following class:

> All customers of Defendant Orange Cab who were sent at least one text message to their cellular telephone number from Defendant Ride Charge without prior express consent.

Plaintiff seeks certification pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3) in order for class members to pursue their claims under the Telephone Consumer Protection Act and the Washington  Commercial Electronic Mail Act, RCW 19.190 *et seq.*

## III. STATEMENT OF FACTS

### A.    RideCharge Competes for Customers Who Use Smartphones

RideCharge is a technology company headquartered in Virginia that owns "Taxi Magic,"

a smartphone application that can be used to order and pay for taxi services.  *See Declaration of Donald W. Heyrich ("Herich Decl."),* Exhs. 3, 4.[1]  RideCharge was started by senior executives from Concur Technologies, Inc. (NASDAQ: CNQR), which has a large ownership stake in RideCharge and a seat on its Board of Directors.  *Deposition of Thomas DePasquale (*Heyrich Decl. Ex. A) 15:24-16:1, 16:20-24, *see also* Exh. 3 at 62.  The entrepreneurs who grew Concur into a $4.5 billion company have positioned Taxi Magic to profit from smartphone growth.  *E.g.,* Exh. 3 at 66.

RideCharge generates revenue when consumers use its Taxi Magic app.  RideCharge collects a fee for these "rides," as well as for rides booked using RideCharge's SMS or Internet booking. *DePasquale Dep.* 20:25-21:10.  RideCharge does not make money when a consumer calls directly to a cab company.  *DePasquale Dep.*  34:12-35:4. Therefore, the explicit goal of company marketing is to "increase electronically booked (online or mobile) methods provided by RideCharge," by turning cab company "voice" customers into RideCharge customers. *DePasquale Dep.* 76: 3-6; Exh. 38.  In the words of RideCharge's president, the company goal is to "move people up the chain to the smartphone." *Id.,* Exh. 37.

**B.     RideCharge Promotes Taxi Magic in Text Messages to Non-Users**

In 2010, RideCharge conceived of a high-impact promotional scheme that could be targeted with precision.  RideCharge invented something it calls a "Dispatch Notification." This is a marketing scheme to send promotional text messages to non-users of RideCharge products. *See DePasquale Dep.* 54:22-55:5.

A "Dispatch Notification" is a text message advertisement sent to a consumer who orders a taxi without using RideCharge products.  *See* Exh. 29 at 147 (graphic illustration); Exh. 20 at 361 (dispatch notifications "[i]nclude brief, high-impact marketing messages" that "rotate to promote different products").  As senior RideCharge manager David Paul confirmed "a [dispatch notification] to me has marketing, and we don't market to someone who's already booking

---

[1] The depositions and exhibits cited herein at attached to the Declaration of Donald W. Heyrich in Support of Plaintiff's Motion for Class Certification.

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

<u>through one of our tools</u>" Exh. 39 (emphasis added); *see also DePasquale Dep*. 67:13-24; 68:6-8. The marketing messages encourage consumers to use RideCharge products instead of calling the local taxi company, and many include an active link to download the Taxi Magic App. *DePasquale Dep*. 76: 3-6.  The marketing messages rotate "so that the customer receives something different with each message and thus pays a little more attention." Exh. 42 at 1003.

   To generate these messages, RideCharge engineered a computer system that extracts data, remotely via the Internet, from independent taxi dispatch systems around the country, specifically (1) telephone number, (2) time of taxi dispatch, and (3) cab number.  The system is programmed to automatically concatenate a text message using custom computer coding.  The data is automatically inserted into a message in a preprogrammed order and then a marketing message is added.  The marketing messages are inserted from a rotating list.  Exh. 29 at 145. RideCharge's own documents describe dispatch notifications as a "Marketing Response" in which RideCharge sends a (1) "marketing message," (2) "<u>automatically,</u>" (3) to the consumers' telephone. Exh. 20 at 361, Exh. 29 at 147.

   These text marketing messages achieve what RideCharge describes as a "high-impact" promotion of Taxi Magic. Exh. 20 at 261.  Quite literally, each message places advertising directly into the hands of a consumer who orders taxis but is not using a RideCharge product, and the active link allows installation of the Taxi Magic app with a couple of taps.  This was not only just a good marketing tool it was RideCharge's "*best* joint marketing tool." Exhs. 41, 42 at 1006-1007 (explaining that the text marketing was core to their business).

**C.    RideCharge Requires Taxi Companies to Allow Text Message Marketing**

   RideCharge promoted "dispatch notifications" to taxi companies as a potential service for their customers, but in truth they were just advertisements for RideCharge. *E.g*., Ex. 43 ("we shouldn't even bother" with dispatch notifications where "none of them promote anything"); Exh. 44 (describing the text messages as a "*gravy train*").  In the words of RideCharge's president:  "Let's turn off Dispatch Notifications if they aren't willing to market us.  And in the future we never want to start DN without our message being in there the first times a user gets

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12–cv–00576–RSL)

Page 4

**HEYRICH KALISH MCGUIGAN PLLC**
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

them it will have the biggest impact on their clicking on our message." Exh. 45.

Taxi companies had no discretion to decide whether "Dispatch Notifications" would benefit their customers. Text message marketing was explicitly *required* in order to do business with RideCharge. Exh. 20 at 357. In addition, RideCharge told cab companies that dispatch notifications would be free *only* if RideCharge could market its own products to the cab company's customers. *DePasquale Dep*. 101:24-102:3. Furthermore, any cab company that hesitated to allow the marketing was threatened with higher prices for rides booked through RideCharge products. *E.g.*, Exh.3 at 89 (prices reflect "co-marketing"); *DePasquale Dep.* 100:20-101:5. ("you pay a little bit more" if you say no to marketing RideCharge's services). As RideCharge explained to a Texas cab company:

> requirement for…co-marketing activity of including a link in the Dispatch Notifications [text messages] that promoted downloading the smart phone app or booking with SMS…any pricing this low for Taxi Magic requires the fleets to do the co-marketing message above, and in return, we establish your fleet as the "default provider" for that user and bypass the directory screen at the opening of the app.

*Id.* Exh 46. (threatening to increase price by over 75% if the cab company did not allow RideCharge advertising to its customers). The entire campaign was propelled by significant internal pressure that was placed on RideCharge's sales team. As one senior official commented, "I told her [a customer] very clearly that I would be in "hot water" with my "boss" for turning off marketing." *Id.* Exh 47.

By September 2010, RideCharge was sending marketing text messages to the customers of cab companies across the United States. Exh. 48 (listing companies and the marketing text). There was not a single one of these messages that did not include marketing. "I ran a list of the messages currently in the system. At this time, no one is running a message that does not include some type of marketing." Exh. 50; *DePasquale Dep.*92:3-9, 94:1-7. Each marketing message was one of nine identical messages. Exh. 49; *see also DePasquale Dep.* 91:12-15.

### D.   RideCharge Sent Promotional Text Messages To Over 100,000 Orange Cab Customers

Beginning on July 30, 2010, RideCharge began sending "dispatch notifications" to Orange Cab customers. *Deposition of Tadesse Woldearegaye* (Heyrich Decl. Exh. B) 39-40, 96.

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12−cv−00576−RSL)

Page 5

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

Defendants have refused to provide any class lists in discovery.  However, RideCharge's internal reports indicate that as many as 100,000 or more consumers received a marketing text message from RideCharge because they called Orange Cab for a taxi.  *DePasquale Dep.* 76: 3-6; 221:9-11 (1,000 marketing messages a day); Dkt. No. 14 ¶ 7 ("more than 10,000 text messages to more than 100 of Orange Cab's customers in Washington that were the same or similar to" plaintiff's). It is highly likely that the number of illegal text messages is significantly higher because Orange Cab provides approximately 8,000 rides every week, and most of those are customers who call Orange Cab.  *Woldearegaye Dep.* at 17; 146-48.

Mr. Gragg, received one of these marketing text messages.  On Saturday, February 25, 2012, Mr. Gragg and several of his friends needed transportation. *Declaration of Torrey Gragg* (*"Gragg Decl."*) ¶2.  At approximately 5:17 p.m., Mr. Gragg called Orange Cab for the nearest available taxi cab. *Id.* ¶ 3.  At no time during this process—or at any time—did Mr. Gragg give any of the Defendants permission to send him a text message. *Id.* ¶ 4.  In fact, Mr. Gragg did not even provide his telephone number to Orange Cab when he called.  *Woldearegaye Dep.* 134:10-13, 136:4-9. His number was captured using electronic caller identification technology and stored in OrangeCab's dispatch computers.  RideCharge then extracted his information from Orange Cab's system, concatenated a marketing text message, and transmitted it to his telephone. *Id; se, also* Ex. 29 at 147.  At 9:04 pm the next evening, RideCharge sent Gragg an unsolicited text message advertisement *Id.* ¶ 5.  RideCharge cannot or will not explain why Mr. Gragg's message was transmitted the next day.  One hundred others also complained that same day of receiving a text message when they had not ordered a taxi.  *See* Exh. 36.

**E.    RideCharge Failed To Obtain Express Consent For Its Marketing Messages**

Instead of obtaining advanced consent, RideCharge's advertising campaign relied on sending messages to every call received, and allowing a consumer to opt-out later.  *DePasquale Dep*. 131:11-20.  The marketing vice president who invented "dispatch notifications" had reservations about this, stating:

> I think the one thing we have to keep in mind is that we send the initial DN [marketing message] <u>without a user request</u>, and then we give them the option to out.  Not quite in

line with MMA [mobile marketing associate] guidelines.

Exh. 40 (Jay McClary, Vice President of Marketing).  Thus, it is undisputed that neither Orange

Cab nor RideCharge asked for express consent.  *Id.* at 118: 1-3.  ("we did not ask that question.

We waited for you to say no").  *Woldearegaye Dep.* 99:24-100:2; 128:23-129:1.  The lack of

consent was conceded by  CEO *DePasquale.*

> Q. So it is fair to say that it was understood at the highest levels of the company that consumers were getting these messages <u>without first expressly opting in?</u>
>
> A. Yes

*DePasquale Dep.* 118: 1-3.  RideCharge anticipated that some consumers would complain

precisely *because* express consent was never part of the plan.  *E.g, DePasquale Dep.* 96:5-8;

Exhs. 42 at 1006-1007, 51 ("I sent a flyer yesterday that should be posted around the call center

to let call takes know how to address concerns from customers who prefer to not receive text

messages").  In one example, RideCharge sent its advertising to a group of low income

individuals who were charged for the text messages.  *Woldearegaye Dep.* 107:4-11; Exh. 33.

RideCharge was requested to immediately stop spamming these individuals, precisely because,

they never received permission in the first place.  *Id.* Express consent was not part of the plan.

## IV. STATEMENT OF ISSUES

Whether this action should be certified as a class action under Fed. R. Civ. P. 23(b)(3) or

23(b)(2).

## V. ARGUMENT

### A.   The Policies Behind Rule 23 Require Certification to Protect the Interests of Justice and the Rights of the Class

Over thirty years ago, the United States Supreme Court confirmed that "[c]lass actions serve

an important function in our system of civil justice." *Gulf Oil Co. v. Barnard*, 452 U.S. 89,

99 (1981). This is particularly true in consumer protection claims where a Defendant

may have committed a multitude of small violations across a large group of

consumers.  As the entire panel of the Washington State Supreme Court recently

stated, "the interests of justice require that in a doubtful case ... <u>any error, if there is to</u>

<u>be one, should be committed in favor of allowing the class action</u>." *Scott v. Cingular*

**HEYRICH KALISH MCGUIGAN PLLC**
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

*Wireless*, 160 Wn.2d 843, 857, 161 P.3d 1000, 1007 (2007) (emphasis added). This Court affirmed the same principle in *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642 (W.D. Wash. 2007), when it held that, under the TCPA, the lack of shifting attorney fees and the small amount in controversy would often create a bar from Plaintiffs seeking relief, undercutting a core purpose of Rule 23:

> If the claims were adjudicated individually, defendant would owe the same amount of damages. Rather, it is hoping that if no class is certified, it will avoid damages for the vast majority of its violations. The Court will not decline to certify a class on that basis. Furthermore, the class size is a direct result of defendant's large number of violations, for which it should not be rewarded.

Id. at 650. Washington is not alone in upholding these core policy considerations in the context of TCPA litigation.  The Kansas Supreme Court looking at the policy behind Rule 23 reached the identical conclusion:

> We do not agree with the defendant's contention that over 100,000 individual small claims actions would be superior to a single class action. While the defendant in such an action might benefit if only a small number of plaintiffs found it worth their while to bring suit or were aware of their rights under the TCPA, this small turnout would serve only to frustrate the intent of the TCPA and to protect junk fax advertisers from liability. It would, accordingly, not provide a "superior" method for individual plaintiffs.

*Critchfield Physical Therapy v. Taranto Group, Inc.,* 263 P.3d 767, 780 (Kan. 2011) (certifying a TCPA illegal marketing class Kansas's equivalent of Rule 23(b)(3)). Thus, although the trial court is afforded great discretion under Rule 23, even close cases (which this is not) should be decided in favor of certification, "for it is always subject to modification should later developments during the course of trial so require."  *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968); *see also Moeller v. Farmers Ins. Co. of Washington*, 173 Wn. 2d 264, 278, 267 P.3d 998, 1004 (2011) (holding that Rule 23 "is to be liberally interpreted because the rule avoids multiplicity of litigation…[and] is always subject to later modification or decertification by the trial court, and hence the trial court should err in favor of certifying the class"); *see also Sax v. World Wide Press, Inc.*, 809 F.2d 610, 615 (9th Cir. 1987) (noting the strong public policy in pursuing claims collectively versus the judicial burden created by an overwhelming sea of individual claims).  It is in this context that

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12–cv–00576–RSL)

Page 8

**HEYRICH KALISH McGUIGAN PLLC**
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

the Court should start with the fundamental "policy of class litigation, which favors filing a single lawsuit rather than many." *Catholic Soc. Services, Inc. v. I.N.S.*, 232 F.3d 1139, 1153 (9th Cir. 2000).

**B.    Rule 23 Certification is Based on the Facts and Legal Theory as Pled**

Although the merits of this case are compelling, the Court need not consider them while deciding this motion for class certification.  "[O]n a motion for class certification, a court may not decide the merits of the case, but must accept the substantive allegations contained in the complaint as true."  5 Moore's Federal Practice & Procedure § 23.46[4] (3d ed.); *see also Freedman v. Louisiana Pacific Corp.*, 922 F. Supp. 377, 398 (D. Or. 1996) (in ruling on motion to certify the court does not consider the merits).  Thus, a district court in considering a motion for certification is "bound to take the substantive allegations of the complaint as true."  *Blackie v. Barrack,* 524 F.2d 891, 901 n.17 (9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976). The factual allegations and legal theories are presumed to be true.

The Ninth Circuit's *United Steel* decision is highly instructive on the proper analysis under Rule 23. *See United Steel v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010).  In *United Steel,* although the district court found that all four provisions of Rule 23(a) had been met, it denied plaintiff's certification motion under Rule 23(b)(3)'s "so-called predominance requirement [because] if Plaintiffs' [liability theory] is rejected…The Court will be faced with a case…requiring individualized trials on each class member's meal period claims…and a class would not be superior method of resolving this suit." *Id.* at 805.  In other words, the district court based its decision to deny certification on defendant's argument that, *if* plaintiff was incorrect about its overarching legal theory, *then* liability could only be established by applying an unmanageable individualized inquiry. *Id.*  The Ninth Circuit reversed the decision finding the district court improperly applied the standard for review of a certification motion and in doing so abused its discretion.  The Ninth Circuit held that

> a court can never be *assured* that a plaintiff will prevail on a given legal theory prior to a dispositive ruling on the merits, and a full inquiry into the merits of a putative class's legal claims is precisely what both the Supreme Court and we have cautioned is not appropriate for a Rule 23 certification inquiry. *See Eisen,* 417 U.S. at 177–78, 94 S.Ct.

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

2140; *Cummings v. Connell,* 316 F.3d 886, 896 (9th Cir.2003) (noting that "this circuit does not favor denial of class certification on the basis of speculative conflicts"); *Staton,* 327 F.3d at 954; *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 480 (9th Cir.1983) (holding that "it is improper to advance a decision on the merits to the class certification stage").

*Id.* at 809. Therefore, when determining whether a case should be certified, the court must accept as true not only the factual allegations as pled in the complaint, but review the requirements of Rule 23 based on "plaintiffs' *actual* legal theory." *Id.* at 808. (emphasis in original); S*ee also S. Ferry LP No. 2 v. Killinger,* 271 F.R.D. 653, 657 (W.D. Wash. 2011) (confirming that a district court must not decide the merits of a factual or legal dispute before it grants class certification).

To be sure, some consideration of the factual predicates of Rule 23 itself is necessary but for the policy reasons stated above, **"**[p]ursuant to Fed.R.Civ.Proc., Rule 23, plaintiff's burden of establishing a factual basis for class certification is not a heavy one.*" Irwin v. Mascott*, 96 F. Supp. 2d 968, 971-72 (N.D. Cal. 1999).  Moreover, "it is generally accepted that Rule 23 should be liberally construed."  Newberg & Conte, *Newberg on Class Action* § 7.20 (4th ed. 2002). Thus, even though the Court must carefully consider each prong of Rule 23, plaintiffs are entitled to the benefit of common sense assumptions regarding these facts. *Id*. at § 7.19-20.

These standards and policy considerations are heightened when the case involves small amounts of individualized damages in a consumer protection action.  Thus, "except where underlying class facts and circumstances are sheer speculation, the initial burden on the party invoking the class action to show class facts is light. A well-pleaded complaint usually constitutes a prima facie showing of these facts sufficient to shift immediately the burden of disproving them to the party opposing the class." *Id.*

## C.    The Class Meets Each of Four Requirements of Rule 23(a)

To be certified as a class, the proposed class must meet all four elements of Fed. R. Civ. P. 23(a), i.e, numerosity, commonality, typicality, and adequacy of representation.  The class must also meet the requirements of any one of the subdivisions of Rule 23(b).  Plaintiffs meet the four requirements of Rule 23(a).  Plaintiffs also have sufficiently met the criteria of Rule 23(b)(3), and alternatively (b)(2) fully discussed *infra.*

**HEYRICH KALISH MCGUIGAN PLLC**
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

1.   <u>Defendants' widespread illegal marketing campaign satisfies numerosity.</u>

Fed. R. Civ. P. 23 (a)(1) requires a proposed class to be so numerous that joinder of all class members in the action is impracticable.  While there is no magic number under federal law which automatically renders joinder impracticable, impracticability of joinder is self-evident in this case.  The proposed class consists of many thousands of customers of Orange Cab and thus clearly meets the numerosity requirement.  *See Slaven v. BP America, Inc.,* 190 F.R.D. 649 (C.D. Ca. 2000) (analyzing Ninth Circuit and treatise authority to conclude that the numerosity requirement is met when the class <u>exceeds 40 members</u>) ; *see also Z.D. ex rel. J.D. v. Grp. Health Co-op., C11-1119RSL, 2012 WL 5033422* (W.D. Wash. Oct. 17, 2012) (affirming that when a class exceeds 40 numerosity has been established); *see also Newberg* § 3:05 at 3-25 ("In light of prevailing precedent, the difficulty inherent in joining as few as [forty] class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone."); see also  *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1320 (9th Cir. 1982) (provided an extensive survey of class certification across the Circuits regarding numerosity—citing cases where the class was composed of as little as seven members).

Defendants have already conceded that they sent at least 10,000 messages to over 100 Washington consumers. Dkt. No. 14 ¶ 7.  Numerosity is easily met.

2.   <u>Common questions of fact and law dominate Plaintiff's class claims due to Defendants uniform illegal marketing campaign.</u>

The second requirement under Fed. R. Civ. P. 23(a) is that there are questions of law or fact common to the class. The Ninth Circuit has instructed that *either* a common issue of law <u>or</u> a common issue of fact is sufficient to meet the requirement.

> All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019-20 (9th Cir. 1998).  The requirement is met by a "minimal" showing and is "not high." *Id.*  As long as "the class members have suffered the same injury" commonality will be established. *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551,

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

180 L. Ed. 2d 374 (2011).   "An alleged common course of conduct is sufficient to satisfy the common question requirement of Fed.R.Civ.P. 23(a)(2)." *Scott v. Aetna Servs.,* 210 F.R.D. 261, 267 (D. Conn. 2002).  *Z.D. ex rel. J.D. v. Grp. Health Co-op.,* C11-1119RSL, 2012 WL 5033422 (W.D. Wash. Oct. 17, 2012) (holding that "nothing more is required" than a single question of either law or fact).

    In examining certification under the TCPA for unsolicited text messages, the Southern District of California, on December 15, 2011, found that in such a text messaging marketing case, *both* common issues of facts as well as common issues of law exist under Rule 23(a)(2).

> Here, the members of the proposed class allegedly each received two text messages: one initial text message that advertised Defendant's products or services, and a second confirmatory text message following the class member's opt-out text message. Thus, in addition to sharing "a common core of salient facts," the class members share one common legal issue: whether the confirmatory text messages sent by Defendant to the class members violated the TCPA. Rule 23(a)(2) is therefore satisfied.

*Lo v. Oxnard European Motors, LLC,* No. 11CV1009 JLS MDD, 2011 WL 6300050, at *2 (S.D. Cal. Dec. 15, 2011).  On similar grounds, this Court certified a junk fax case finding commonality where plaintiff sufficiently pled that defendants sent unsolicited facsimiles to a class of over 3,000 persons.

> The TCPA will apply to all class members, and Washington law will apply to all members of the Washington subclass. Furthermore, it is undisputed that [defendants] engaged in a common course of conduct by obtaining the facsimile numbers in the same way and sending the same broadcast facsimile[4] to all recipients within a short period of time as part of the same effort to generate new business….accordingly, the commonality requirement is met.

*Kavu,* 246 F.R.D. at 647.  Moreover, in this last year, the Western District on three occasions found commonality under nearly identical TCPA claims where plaintiffs alleged that defendants had autodialed consumers' cellular telephones without their express consent.  *See Agne v. Papa John's Int'l,* 286 F.R.D.559, 567-68 (W.D.Wash. 2012) (building upon this Court's decision in *Kavu* ruling and finding commonality where plaintiff had pled "class members were sent substantially similar unsolicited text messages by the same defendants, using the same automatic dialing technology, commonality is satisfied."); *Arthur v. Sallie Mae, Inc.*, No. C10-0198JLR, 2012 WL 90101, at *6-7 (W.D. Wash. Jan. 10, 2012) (holding that "because commonality

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12–cv–00576–RSL)

Page 12

HEYRICH KALISH McGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

requires only a single common question" Rule 23(a)(2) has been established); *McClintic v. Lithia Motors, Inc.,* No. C11-859RAJ, 2012 WL 112211, at **3-4 (W.D. Wash. Jan. 12, 2012) (finding certification appropriate under Rule 23(a) and Rule 23(b)(3) when defendants spammed over 58,000 consumers with text messages to solicit their product.[2]  The court held in such TCPA and CEMA illegal text message marketing cases that "common questions arising from [defendant's] marketing campaign predominate," and therefore, certification is appropriate on those grounds.).

Here, the facts are nearly identical to those certified by the Western District of Washington last year in *Agne, Arthur*, and*, McClintic.* Defendants used functionally an <u>identical</u> ATDS to send over 10,000 marketing messages to consumers in Washington. This uniform marketing scheme caused <u>identical</u> statutory violations and give rise to <u>identical</u> statutory damage claims by all of the class members. From this marketing campaign, common facts predominate such as (1) dispatch notices were sent to every consumer with a cell phone who order a taxi from Orange Cab, (2) each message sent to an Orange Cab customer was done by RideCharge, (3) each dispatch notice contained one of 9 identical marketing messages; (4) Defendants based their consent to send these marketing messages by the mere fact that someone called for a taxi; and (5) the marketing was done with an automated "TaxiMagic" computer system, which used an identical process each transmission.

Moreover, all liability issues are common to the class. Common issues of liability are predominant because the conduct itself—and therefore any legal defenses to it—apply with equal force to Mr. Gragg as they would to any other putative class member.  *See Durrett v. John Deere Co*., 150 F.R.D. 555, 558 (N.D. Tex. 1993) ("Because this action arises out of a single type of contract that is virtually, if not completely, identical in each transaction with [the company], common questions of law and fact abound").  Common questions of law in the instant case

---

[2]It should be that noted in *Arthur,* because the court was considering certification in the context of a settlement, the court found the standard was heightened from a contested matter; "[t]he court must pay undiluted, <u>even heightened</u>, attention to class certification requirements' because, unlike in a fully litigated class action suit, the court will not have future opportunities 'to adjust the class, informed by the proceedings as they unfold." *Arthur*, 2012 WL 90101, at *6 (emphasis added).

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

include but are not limited to (1) whether Defendants' contention that providing your phone number in connection with taxi services is sufficient to establish a business relationship; (2) whether an established business relationship is a defense to sending text messages to a cellular phone without express consent under the TCPA and/or CEMA; (3) whether a text message is a phone call within the meaning of the TCPA; (4) whether the system used by RideCharge qualifies as an "auto-dialer" under the TCPA; (5) whether the text message is considered a "commercial electronic text message" under RCW 19.190.060; and (6) whether the violation of the TCPA was "knowing" or "willful."  Each of these overarching legal issues is raised by the common pleading in Plaintiffs' complaint. *See Agne*, 286 F.R.D. at 567-568 (finding the identical common issues under both the TCPA and Washington law in certifying a text blasting case under Federal Rule 23). Consequently, the presence of these common issues of both fact and law each separately satisfy the minimal pleading prerequisite of commonality.  Finally, because these questions are common to the entire class and predominate all individual issues, certification of the class will provide the superior method for ensuring fair and efficient adjudication, meeting the necessary 23(b) findings as well.  *See infra.*

3.  Mr. Gragg's claims are typical of the class and no conflict exists.

The third prerequisite for a class certification under Fed. R. Civ. P. 23(a)(3) is that the claims or defenses of the class representatives be typical of those of the class members.  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented the typicality requirement is usually satisfied, irrespective of varying fact patterns which underlie individual claims."  Kavu, 246 F.R.D. at 648 (finding typicality under the TCPA where plaintiff alleged it received the same improper facsimile from the named defendant); *see also Lo*, 2011 WL 6300050, at *3 (holding that because "plaintiff and the class members assert the same violation of the TCPA arising from the confirmatory text messages sent by Defendant, Plaintiff's claims are typical of the claims of the class members"); *Agne*, 286 F.R.D. at 569 (holding plaintiff's "claims, like all class members' claims, arise from text marketing campaigns commissioned by Papa John's franchisees and executed by the same

marketing vendor" and therefore typicality exists).

Typicality exists if the claims of the class representative and the members of the class "stem from a single event or are based on the same legal or remedial theory." 7A Wright & Miller, Federal Practice and Procedure § 1764. The Ninth Circuit has held that, where the challenged conduct is out of a common practice imposed against all class members,

> the typicality inquiry involves comparing the injury asserted in the claims raised by the named plaintiffs with those of the rest of the class. We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct.

*Armstrong v. Davis,* 275 F.3d 849, 868-69 (9th Cir. 2001). Here, Mr. Gragg was subjected to the same illegal marketing campaign, by the same marketing vendor, soliciting him to respond to the DN-Marketing text and to download services from RideCharge. His claim is not only typical but it is identical to the common claims of the class, *i.e.* a violation of the TCPA and WCPA based on this specific marketing campaign.

4.    The class is adequately represented by both Mr. Gragg and class counsel.

The fourth prerequisite, adequate representation, is meant to ensure that the absent class members are properly represented by both the named class representatives and their attorneys. "Rule 23(a)(4) permits the certification of a class action only if the representative parties will fairly and adequately protect the interests of the class." *Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir. 2003). In *Staton,* the Ninth Circuit established the test for adequacy as follows: "To determine whether the representation meets this standard, we ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

Mr. Gragg is capable of "fairly and adequately protect[ing] the interests of the class." Fed. R. Civ. P. 23 (a)(4); *Gregg Decl.*¶¶ 7-8. His common interests with the class are addressed above. There are no conflicts of interest between Mr. Gragg and the class members. The class and Ms. Gragg were subjected to the same illegal marketing practices of Defendants. Mr. Gragg takes his role as class representative seriously and is committed to and protecting the interests of the class. *Id.*

1    Finally, counsel for the class has extensive experience in class action lawsuits, and are

2    adequate counsel for the class.  The class would be represented by class counsel Donald W.

3    Heyrich, founding partner of Heyrich Kalish McGuigan PLLC and Albert H. Kirby of the Kirby

4    Law Group.  *Heyrich Decl.* ¶¶ 2-9.  Counsel's experience is further outlined in Mr. Heyrich's

5    declaration.  *Id.*  Combined, plaintiff's have substantial experience in class, collective and

6    representative actions and are amply qualified to handle the claims in this lawsuit.  *Id.*  Counsel

7    takes their responsibility seriously and is committed to the resources and advocacy necessary to see

8    this case brought to resolution.  *Id.*

9    **D.    A Class Action is Maintainable Under Both Rule 23(b)(3) and, Alternatively, Under Rule 23(b)(2)**

10    A plaintiff meeting the requirements of Rule 23(a) must also demonstrate that the case is

11    maintainable as a class action under Rule 23(b).  The test asks whether, taking the facts and legal

12    theory as pled by the Plaintiff—as well as a common sense review of the evidence developed

13    thus far, the case presents a manageable class action.  *See United Steel*, 593 F.3d at 809; *see also*

14    *Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571, 582 (9th Cir. 2010), *rev'd on other grounds,* 131 S.

15    Ct. 2541, 180 L. Ed. 2d 374 (2011).  Again, "[t]he benefit of any doubts as to manageability

16    should be resolved in upholding the class, subject to later possible reconsideration."  *Newberg* §

17    7:26.  Here, Plaintiffs seek certification per Rule 23(b)(3) and alternatively under Rule 23(b)(2).

18    Each test is considered below.

19    1.    Class certification is maintainable under Rule 23(b)(3) because common questions predominate over individual inquiries and the class mechanism is

20    superior to thousands of individual cases.

21    As a consequence of Defendants' broad and uniform illegal marketing practice, the class is

22    maintainable under Rule 23(b)(3).  Plaintiff easily vaults the various Rule 23(a) criteria, and this is

23    perhaps the best indicator that Rule 23(b) (3) is satisfied.  *See Rossini v. Ogilvy & Mather, Inc.,* 798

24    F.2d 590, 598 (2d Cir. 1986) (satisfaction of Rule 23(a) "goes a long way toward satisfying the Rule

25    23(b) (3) requirement of commonality").  When seeking "opt-out" class certification, the plaintiff

26    must fulfill the additional requirements set forth in Rule 23(b)(3): (1) common questions must

27    predominate over any questions affecting only individual members; and (2) class resolution must

**HEYRICH KALISH MCGUIGAN PLLC**
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

1  be superior to other available methods for the fair and efficient adjudication of the controversy.

2  Fed.R.Civ.P. 23(b) (3); *see, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997).

3      **Predominance.** This Court has long recognized "that the predominance of common

4  issues requirement under Rule 23(b)(3) is a test readily met in certain cases alleging consumer …

5  fraud." *Mortimore v. F.D.I.C.,* 197 F.R.D. 432, 438 (W.D. Wash. 2000), *citing Amchem Prods.,*

6  *Inc. v. Windsor,* 521 U.S. 591 (1997).  The reason is simple: when a defendant takes a common

7  action (here, text marketing) and applies it to a mass group of consumers, the defenses and

8  necessary proof overwhelmingly applies to the class as opposed to any individual.  *See generally,*

9  *Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168, 1174 (9th Cir. 2010) (reversing the

10  district court's denial of certification and holding that in a consumer protection class action

11  common issues predominate in spite of defendants individualized causation theories); *see also*

12  *Kelley v. Microsoft Corp.,* 395 F. App'x 431, 432 (9th Cir. 2010) (reversing the district court's

13  denial of certification in an alleged illegal marketing practice to consumers by Microsoft holding

14  that the Court improperly failed to balance the common issues of law and fact established in its

15  commonality findings under Rule 23(a)(3), as well as the inherent commonality in a CPA claim).

16  Moreover, as this Court held even "A single common issue may be the overriding one in the

17  litigation, despite the fact that the suit also entails numerous remaining individual questions."

18  *Olson v. Tesoro Ref. & Mktg. Co.,* C06-1311RSL, 2007 WL 2703053 (W.D. Wash. Sept. 12,

19  2007)

20      Here, it is evident that Defendants' illegal marketing campaign and the common and

21  uniform transmission of over 100,000 text messages is the predominant and overarching issue

22  being litigated before this Court. If the Court finds later on summary adjudication that giving

23  your phone number when inquiring about taxi services is sufficient basis for consent under the

24  TCPA and CEMA, such a decision shall apply to <u>every</u> class member.  If the Court determines

25  that the computer system used is an auto-dialer under the TCPA, then that determination will

26  apply to <u>every</u> class member.   If Defendants argue that because they dialed from a known list of

27  identified numbers there is no violation of the TCPA or CEMA, this contention applies equally to

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12−cv−00576−RSL)

Page 17

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

1    every transmission.  If under Washington law there is a *per se* violation of CEMA, then the *per*

2    *se* statutory $500 recovery applies with equal force to every member of the class.

3          Therefore, this case will not simply be determined predominately by class-wide issues of

4    law and fact, but those issues overwhelm all others.  Again the Western District's rulings are

5    directly on point.  In *Agne*, a third party marketing company send text advertisement to Papa

6    John's customers. *Agne*, 286 F.R.D. at 561-63. There, Judge Coughenour found that the common

7    process, vendor, and similar text messages used in the illegal marketing campaign created

8    common legal issues and answers which will one way or another "resolve an issue that is central

9    to the validity of each of the claims in one stroke." *Id.*at 567.

10         Judge Coughenour's decision in *Agne* simply built upon this Court's 2007 decision in

11    *Kavu* regarding an similarly pleaded claim for violations of the TCPA and WCPA due to the

12    transmission of unsolicited facsimiles.  There, the Court found that the case should be certified

13    under Rule 23(b)(3) because both predominance and superiority had been established. *Kavu,* 246

14    F.R.D. at 650 (holding that violations of the TCPA and WCPA predominate any individualized

15    inquires regarding an illegal fax marketing campaign).  Moreover, the Court again in 2012 found

16    predominance in a TCPA certification case accepting plaintiff's contention that "common

17    questions present a significant aspect of the case" where defendants had engaged in automatic

18    telephone calls to plaintiffs cellular phones in violation of the act. *Arthur,* 2012 WL 90101, at

19    *8-9. Moreover, two days later the Western District reaffirmed that Rule 23(b)(3) was well

20    established in an illegal text message marketing case under the TCPA and Washington Consumer

21    Protection Act finding "the proposed class satisfied the "superiority" requirement of Rule

22    23(b)(3)" and "common issues of fact and law…predominate in this action" when—like here—

23    plaintiffs challenged defendants conduct of sending over 58,000 text messages to consumers'

24    cellular phones advertising a sale without their consent.  *McClintic,* 2012 WL 112211, at *3; *see*

25    *also Grannan v. Alliant Law Group, P.C.,* No. C10-02803 HRL, 2012 WL 216522, at * 5 (N.D.

26    Cal. Jan. 24, 2012) (finding predominance and superiority under a Rule 23(b)(3) TCPA

27    settlement when defendants autodialed plaintiffs' cellular phones without their express consent).

**HEYRICH KALISH MCGUIGAN PLLC**
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

The court in *Lo* similarly found manageability under 23(b)(3) where the focus of the inquiry was on a common alleged violation of the TCPA; "[H]ere, a common issue predominates over any individual issue—namely, whether the transmission and content of confirmatory text messages allegedly sent by Defendant to all class members violates the TCPA". *Lo,* 2011 WL 6300050, at *2.

A more colorful analysis comes from the Northern District of Illinois certifying a TCPA class action due to unsolicited fax transmissions under Rule 23(b)(3). In rejecting defendants' argument that the case would be plagued with evidence of individual questions of consent (that only the defendant possessed and had not produced), the court responded "[Defendants'] contention that questions affecting only individual members would predominate over class issues is no better than pure fiction-and a pretty poor quality of fiction at that." *Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894, 898-99 (N.D. Ill. 2010).

In this case not only do common issues predominate but they make up virtually every dispositive issue that will be before the Court.

**Superiority.** The next inquiry is whether the class action mechanism itself is the superior mechanism for resolving this claim. Again, this Court's holding is directly on point finding that superiority is met in a TCPA and CEMA claim based on unsolicited marketing:

> The purpose of this rule is to identify those actions in which certification of a class would achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.
> ....
> In this case [under the TCPA and CEMA], individual damages are small, and class members would be unlikely to litigate claims on their own. In fact, no other claims have been filed based on [Defendants] broadcast facsimile. Based on the recency of the statute, potential class members may be unaware of their legal rights. Defendant argues that potential class members could sue individually because the CPA provides for recovery of attorney's fees. While attorney's fees are available for Washington plaintiffs, they are not available under the TCPA.
>
> The parties have not identified any difficulties likely to be encountered in the management of this class action. This Court is an appropriate forum for this action because plaintiff seeks to represent

*Kavu,* 246 F.R.D. at 650; *see also Agne*, 286 F.R.D. at 571-72 (finding superiority do to the large size of the class and comparative small value of claims under the TCPA and WCPA); *Arthur,*

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington 98101
(206) 838-2504

2012 WL 90101, at **8-9 (finding superiority under a pled TCPA claim, because such claims by their nature have "individual damages [which] are small and class members are unlikely to litigate claims on their own.").

Here, as in *Agne, Kavu*, *Arthur,* and *McClintic,* Plaintiff seeks to certify a case under the TCPA with a CEMA subclass.  The identical statutory damages are involved ($500 or $1,500 depending on whether the jury finds the conduct willful or knowing), and therefore, "individual damages are small, and class members would be unlikely to litigate claims on their own." Moreover, "no other claims have been filed based on Defendants broadcast [text messages.]." When considering whether a class action is superior to individual actions, "economy and efficiency are considered the most important elements of the inquiry." *In re Washington Mut. Mortgage-Backed Sec. Litig.,* 276 F.R.D. 658, 668 (W.D. Wash. 2011).  Where the Court is faced with the adjudication of many thousands of claims based on an admitted "practice and procedure" of wide-spread conduct, "[i]t is beyond dispute that having all claims of the class litigated at once will serve judicial economy and efficiency." *Id.*

Finally, this Court is more than capable of managing the size and scope of this class. While this litigation would involve thousands of class members, this class action is readily manageable, particularly when compared to Rule 23 classes in other larger and more complicated cases that have been managed successfully through settlement or trial.  *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54 (D. Mass. 1997) ("class consists of persons or entities who have or had an ownership interest in one or more of approximately 3.8 million [insurance] policies") (nationwide class of approximately three million); *Sollenbarger  v. Mountain States Tel. and Tel. Co.*, 121 F.R.D. 417 (D.N.M. 1988) (antitrust class of thousands consisting of all telephone customers in several states approved); *In re Cement and Concrete Antitrust Litig.,* 27 Fed.R. Serv.2d 1334 (D. Ariz. 1979) (antitrust class of approximately 500,000).  The "Court is well versed in the subject matter of this litigation and is no stranger to handling complex class action litigation." *In re Washington Mut. Mortgage-Backed Sec. Litig.,* 276 F.R.D. at 668.

Defendants' uniform policy and practice of sending DN-marketing messages without

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12–cv–00576–RSL)

Page 20

prior express consent not only creates legal and factual issues that predominate over the entire class; these policies and practices constitute every dispositive issue before the Court. Requiring Orange Cab's customers to individually litigate their claims is not superior to a single resolution of these issues. The class is readily available, clearly defined, and identifiable. Therefore, as in *Agne, Kavu, Arthur, McClintic,* and *Lo,* the Court should grant certification under Rule 23(b)(3).

**E.     In the Alternative, a Class Certification Is Maintainable Under Rule 23(b)(2) Because Plaintiff Seeks Injunctive Relief to Stop all Future Violations of the Law**

Under Fed. R. Civ. P. 23(b)(2), certification is appropriate when the court finds "[t]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Kavu,* 246 F.R.D. at 649. Mr. Gragg alternatively seeks certification under Rule 23(b)(2), as Mr. Gragg's request for equitably relief is an equal, if not predominate, motivation for his request of enforcement under the TCPA. "It is also well settled that a class can be certified under 23(b)(2) even though monetary damages are sought in addition to injunctive relief." *Mortimore v. F.D.I.C.,* 197 F.R.D. 432, 438 (W.D. Wash. 2000). Moreover, the Ninth Circuit has repeatedly affirmed that as long as damages are not the predominate purpose of the litigation, certification under Rule 23(b)(2) is appropriate. *Wang v. Chinese Daily News, Inc.,* 623 F.3d 743, 754 (9th Cir. 2010) *cert. granted, judgment vacated,* 132 S. Ct. 74 (2011). This Court, in analyzing Rule 23(b)(2) in the context of the TCPA, found certification appropriate:

> It is more unlikely that Kavu would undertake this action, particularly as a class representative, for a recovery that is unlikely to exceed $500. Furthermore, Kavu's representative states that Kavu "receives large numbers of unwanted facsimile advertisements every year" and its "primary interest in bringing this action is to stop companies like Defendant from continuing the practice of sending unsolicited facsimile advertisements."
>
> In addition, the damages sought are incidental to the primary claim for injunctive relief because damages are statutory and a fixed amount. Accordingly, damages may be awarded based on objective standards rather than based on complex, individual determinations. ... In this case, damages will be (1) nothing, if defendant prevails on its argument that its violations were "immaterial," (2) $500 if it does not prevail on that claim, or (3) $1,500 if the Court finds that its conduct was willful. Because defendant engaged in the same conduct regarding all of the class members, the damages issues and calculations will be the same for all. Moreover, if plaintiff proves its allegations, injunctive relief would benefit all class members.
>
> For all of these reasons, the Court finds that certification under Rule 23(b)(2) is appropriate

because Omnipak has acted on grounds generally applicable to the class, and final injunctive or declaratory relief is appropriate for the class.

*Kavu*, 246 F.R.D. at 649 *(internal citations omitted)*.  As outlined above, Mr. Gragg is seeking damages of a fixed amount under the TCPA based on clear allegations and supporting evidence that "[RideCharge and Orange Cab] has acted on grounds generally applicable to the class, and final injunctive or declarative relief is appropriate for the class."  Certification under Rule 23(b)(2) is appropriate.

Finally, Plaintiff acknowledges that careful consideration must be given to the recent United States Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2557, 180 L. Ed. 2d 374 (2011). There, the Court concluded that Rule 23(b)(2) certification is inappropriate if damages are individualized to each class member, such as a claim for back pay, different wage loss, or emotional damages.  The Court explained that the nature of individual damages triggers due process considerations which are only addressed by Rule 23(b)(3) certification.  *Id.*  Here, however, as noted in *Kavu*, Mr. Gragg is not seeking individualized damages, but statutory damages that are universal and fixed across the entire class.  Thus, as originally held by this Court, certification is appropriate under Rule 23(b)(2).

## VI.   CONCLUSION

Defendants engaged in a uniform and illegal marketing campaign that violated the rights of thousands of consumers in Washington State and across the country.  Defendants' violations of the TCPA and CEMA were caused from the same marketing campaign carried out by RideCharge and premised upon a legal theory that ordering a taxi was sufficient to establish consent for commercial solicitation.  As recognized in *Kavu*, *Agne, Arthur*, and *McClintic,* such TCPA and CEMA claims are predominately common issues of fact and law, which make the class action mechanism superior to flooding this Court with tens of thousands of individual adjudications.  Judicial efficiency, justice, and the policies of Rule 23 support certification of this matter.

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

1

2      RESPECTFULLY SUBMITTED:  June 14, 2013

3

4            _/s/ Donald W. Heyrich, WSBA #23091_
             Donald W. Heyrich, WSBA #23091
5            **HEYRICH KALISH MCGUIGAN PLLC**
             1325 Fourth Avenue, Suite 540
6            Seattle, WA  98101
             Tel: (206) 838-2504
7            Fax: (206) 260-3055
             Email: dheyrich@hkm.com
8
             Albert H. Kirby, WSBA #40187
9            **KIRBY LAW GROUP**
             93 S. Jackson St. #63230
10           Seattle, WA 98104-2818
             Tel: (206) 414-9950
11           Fax: (866) 845-6302
             Email: ahkirby@kirby-legal.com
12
             Attorneys for Plaintiffs
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
(Case No. 2:12−cv−00576−RSL)

Page 23

**HEYRICH KALISH MCGUIGAN PLLC**
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504

1

## **DECLARATION OF SERVICE**

2        I, the undersigned, certify that, on this date, a true copy of the foregoing document will be or

3  has been served on the persons listed below in the manner shown:

4

5        Kenneth E. Payson, WSBA #26369          ___ Legal Messenger
           kenpayson@dwt.com                      ___ Facsimile
6        Ryan C. Gist, WSBA #41816               ___ United States Mail, First Class
           ryangist@dwt.com                       ___ Direct Email
7      DAVIS WRIGHT TREMAINE LLP               _x_ CM/ECF Notification
       1201 Third Avenue, Suite 2200
8      Seattle, WA 98101-3045
       Telephone: 206-622-3150
9      Fax: 206-757-7700

10

11

12                                          Dated: June 14, 2013
                                             /s/ Donald W. Heyrich
13                                          Donald W. Heyrich, WSBA #23091

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**HEYRICH KALISH MCGUIGAN PLLC**
1325 Fourth Avenue, Suite 540
Seattle, Washington  98101
(206) 838-2504